Susan P. HALLGREN, Petitioner,

v.

**DEPARTMENT OF PUBLIC WELFARE, Respondent.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs Jan. 30, 1998.
Decided March 16, 1998.

Diane S. Tosta, Norristown, for petitioner.

P. Amber Jones, Harrisburg, for respondent.

Before PELLEGRINI and FRIEDMAN, JJ., and JIULIANTE, Senior Judge.

JIULIANTE, Senior Judge.

Petitioner Susan Hallgren petitions for review of the May 16, 1997 order of the Department of Public Welfare, Bureau of Hearings and Appeals (Bureau) affirming the Hearing Officer's May 8, 1997 denial of Petitioner's appeal of United Cerebral Palsy of Lancaster County's (UCP's) termination of attendant care services (AC services) under the Attendant Care Services Act (the Act).[1] Under the Act, physically disabled and mentally alert persons from 18 to 59 years of age who meet certain eligibility requirements may receive basic and ancillary services which enable them to live at home and in the community rather than in an institution. Section 3 of the Act, 62 P.S. § 3053. We

---

1. Act of December 10, 1986, P.L. 1477, *as amended*, 62 P.S. §§ 3051–3058.

affirm the Department's order terminating AC services.

Hearing Officer Claudia Maines held a hearing on June 24, 1996 and adduced the following facts:

1. UCP administers services for the Department in Lancaster, Chester and Lebanon Counties.

2. The Appellant resides with her husband and three sons. The Appellant and two (2) of her sons, Jason Hallgren, age 23 at the time of the hearing, and Christopher [sic [2]], age 20 at the time of the hearing, have Muscular Dystrophy.

3. Both the Appellant and her son Jason were authorized for services on or about November 11, 1991.

4. During July 1992, Jason was hospitalized. He did not return home until approximately five (5) months later.

5. On October 13, 1992, UCP issued written notice terminating services for the Appellant on the basis of abuse of service, forged time sheets, submission of time sheets for services not provided and failure to disclose a hospitalization. [Original Record "O.R.," Exhibit C–12.]

6. The Appellant filed a timely appeal.

7. Neither the Appellant nor Jason have received services since July 20, 1993.

(Findings of Fact Nos. 1–7.)

Before the Hearing Officer, Petitioner alleged that no one informed her of the requirement that she had to report a hospitalization. Further, with regard to the hours per week she billed for Jason during his hospitalization, she contended that some of those hours were used to provide her with transportation to the hospital, to provide care and/or to get training for future care of Jason, to maintain Jason's living space during his hospitalization and to provide care for her then minor son Christian.[3]

In denying Petitioner's appeal from UCP's termination of services, the Hearing Officer noted that the Reduction and Termination of Service section of the 1992–1993 Attendant Care Program Requirements provides that "[a] contractor shall reduce or terminate service to consumers when, in the contractor's professional judgment ... the consumer's uncooperative behavior and abuse, misuse of the service or the program" occurs. (O.R., Exhibit C–1; Section VIII, part H(1)(c) of the 1992–1993 AC Program Requirements.)

The Hearing Officer concluded that UCP had not abused its discretion in terminating service in light of Petitioner's sworn testimony that she submitted bills for Jason for hours of service not provided to him. The Hearing Officer recognized Petitioner's dual role as Jason's representative and as a consumer, but noted that even though she may not have personally abused the service, her "role as a representative for Jason in submitting bills for service not provided to him demonstrates uncooperative behavior and abuse/misuse of service which also taints her role as a consumer." (Hearing Officer's Adjudication at 3.) The Hearing Officer granted no weight to Petitioner's testimony that "she thought sharing of hours with nonapproved family members [Christian] was appropriate and, by inference, acceptable to UCP." (*Id.*)

The Director of the Bureau of Hearings and Appeals affirmed the Hearing Officer's Adjudication. Petitioner filed a timely appeal with this Court.

 There are two issues for our review: 1) whether the Department erred in determining that UCP's termination of AC services was correct based on UCP's professional judgment that Petitioner demonstrated uncooperative behavior and abuse and misuse of the service or the program; and 2) whether Petitioner met her burden of establishing equitable estoppel against a government agency. Contrary to Petitioner's proffered "capricious disregard" scope of review,[4]

---

**2.** The second son's name is Christian.

**3.** Under Section 3 of the Act, 62 P.S. § 3053, AC services are available to eligible adults only. *See also* O.R., Exhibit C–1; Section III, Part F of the 1992–1993 AC Program Requirements.

**4.** This case is governed by Section 704 of the Administrative Agency Law, 2 Pa.C.S. § 704. The "capricious disregard" test applies only if the burdened party does not prevail before the agency and is the only party to present evidence. *Lautek Corporation v. Unemployment Compensa-*

this Court must affirm the adjudication of the Bureau unless we find that the adjudication is in violation of constitutional rights, or is not in accordance with the law or that any finding of fact made by the Bureau and necessary to support its adjudication is not supported by substantial evidence. *York County Children and Youth Services v. Department of Public Welfare,* 668 A.2d 185 (Pa.Cmwlth.1995).

Petitioner argues that the Bureau erred in disregarding the regulation that permits attendants to accompany consumers on trips or stays away from home and the one that governs receipt of service during hospitalization. Further, she contends that the Bureau erred in disregarding the humanitarian purpose behind the Act, which essentially is to promote adults being able to live in their own homes rather than institutions.

The regulation governing in-state or out-of-state travel provides that, with certain restrictions, "[a]ttendants may accompany consumers on business trips, vacations or other temporary stays away from home." (O.R., Exhibit C–1; Section IV, Part E of the 1992–1993 AC Program Requirements.) The Hearing Officer, however, did not base her decision on the attendant transporting Petitioner to the hospital in order to visit Jason. As the Hearing Officer stated, "Appellant may not have personally abused/misused the service received as a consumer."[5]

The regulation governing receipt of service during hospitalization provides as follows:

> Consumers of Attendant Care Service who are temporarily hospitalized may continue to receive Service as long as they meet eligibility requirements and the services provided by the attendant do not duplicate or replace those services available through other third-party payers. Contractors shall conduct an assessment of need and adjust the service plan accordingly. Such plans shall be reviewed by the

contractor at least every two weeks; continued payment for services beyond 30 days shall be subject to approval by the Department.

> This option must be explained to a consumer during the initial visit after acceptance into the Attendant Care Program, and/or a pamphlet may be given explaining this option. After the initial explanation, this option must be reviewed with consumers at least· one other time, preferably during reassessments.

(O.R., Exhibit C–1; Section IV, Part F of the 1992–1993 AC Program Requirements.)

The Hearing Officer did not specifically address the above-quoted regulation in her adjudication. The basis for her decision was Petitioner's sworn testimony that she submitted bills for Jason for hours of service not provided to him.[6] Nonetheless, we conclude that the evidence indicating that Petitioner was aware that submitting bills for Jason during his extended hospitalization was at odds with the program requirements supports the Hearing Officer's finding that Petitioner abused the program.

Attendant care coordinator Francis Neal testified as to a log note regarding a call that he received from Petitioner.

Q. Now, you had a conversation [with Petitioner] then around 10/5/92 at that point?

A. 10/6/92, I spoke with S. [Petitioner] over the phone.

Q. And what did she say?

A. She called and asked me if I had the mess figured out. I asked her what she wanted to tell me. She asked me if my supervisor listened in on the speaker phone. I asked S [Petitioner]. S. Agreed. S. explained that she knew—she should have called when J. [Jason] went into the hospital but she was afraid she would lose

---

*tion Board of Review,* 138 Pa.Cmwlth. 547, 588 A.2d 1007 (1991).

5. On page 12 of its brief, the Department acknowledges that Petitioner's 13 hours are not in dispute. Presumably, that transportation would have come under the 13 service hours authorized for Petitioner in her own right.

6. Petitioner testified that Jason went to the hospital in July of 1992 and then to a pediatric center and that he did not return home for approximately five months. (N.T. 112–113.) She also testified that she submitted bills, which included her hours and those of Jason, during that five-month period. (N.T. 91–97.)

hours. Thought she was doing the right things, said I know, that it is a problem. (June 24, 1996 Hearing, N.T. 42.)

In addition, former AC attendant Christine Brown testified as follows:

Q. Do you recall in [sic] the events around October 5, 1992, when you quit the H.'s [Hallgrens]?

. . . . .

A. I don't know exactly what—alls I know is that she [Petitioner] asked me to take the van so that when the lady from UCP was coming to the house, Janet, when she was coming to the house that she could tell Janet that J. [Jason] and I were out. And I told her, no, that I would not do that, and I walked out. So then when I went home, that's when I called Frank [Neal] because I had to tell him that I quit, so that he could find another person to work for them . . . .

Q. What was the purpose of telling you to go take the van?

A. Because J. [Jason] was not there, J. was in the hospital.

(N.T. 66.)

In addition, Petitioner was aware of the fact that any care rendered to her then minor son Christian was to be incidental to the hours attributed to her and Jason.[7] Therefore, we conclude that the Department did not err in determining that UCP's termination of AC services was correct based on the latter's judgment that Petitioner demonstrated uncooperative behavior and abuse and misuse of the service or the program.

In her second issue, Petitioner raises the question of whether the Department was equitably estopped from terminating AC services due to the testimony of a former AC program director that, given the severity of the situation in Petitioner's household, her minor son was also to be included in the program. We find no merit to Petitioner's equitable estoppel argument.

In order to establish estoppel on the part of the government, a party must prove:

(1) intentional or negligent misrepresentation of some material fact, (2) which was made with knowledge or reason to know that the other party would rely upon it, and (3) inducement of the other party to act to his or her detriment because of justifiable reliance upon the misrepresentation.

*Strunk v. Zoning Hearing Board of Upper Milford Tp.*, 684 A.2d 682, 685 (Pa.Cmwlth. 1996).

■ The record reflects that both AC coordinator Frank Neal and former AC program supervisor Gail Hoffmann acknowledged that Christian would incidentally benefit from the hours attributed to Petitioner and Jason. (N.T. 138–139.) Mrs. Hoffmann analogized the situation with Christian to one where a disabled consumer had an infant that needed to be diapered and fed. The infant would not be an eligible consumer, but would incidentally benefit from the hours attributed to the disabled consumer parent. Similarly, Petitioner's husband, who is not physically disabled, would also incidentally benefit from an attendant helping his wife to maintain a clean house and groceries in the cupboards.

There is simply no evidence of record indicating that someone from the Department or any agency ever represented to Petitioner that, if Jason went into the hospital, she could continue to bill for his hours under his name and simply substitute Christian for

7. With regard to Christian's receipt of any benefits, Petitioner testified that Frank Neal told her that he was going to give her and Jason enough hours so that her husband's work load would be alleviated. Specifically, she testified as follows:
A. He [Frank Neal] said that we know there is a situation here, we know this is a very difficult and extreme situation. It is certainly not the general rule of thumb. And that because he's [Christian] under 18 or 21, he was not technically on paper able to receive benefits. But that he [Neal] was going to give us enough, a total of 49 [hours] which is quite a bit. The average is around 21. And he would give us enough that we would be able to at least take part of the work load off of my husband and that C. [Christian], though he would not have the full amount of work— people working with him, that J. [Jason] required, they would at least be able to come in and function among the three of us so that C. at least could get a shower and get some minimal amount of help . . . .
(N.T. 101–102.)

named consumer Jason. There is only evidence of an acceptance and acknowledgement that Christian would incidentally benefit from the hours attributed to Petitioner and Jason. That is all.

Accordingly, for the above reasons, we affirm the Department's order terminating AC benefits.

### ORDER

AND NOW, this 16th day of March, 1998, it is hereby ordered that the May 16, 1997 order of the Department of Public Welfare, Bureau of Hearings and Appeals, is AFFIRMED.